UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:14-CR-00001-TBR

UNITED STATES OF AMERICA                                                          Plaintiff,

v.

NORMAN DWIGHT PARKER                                                              Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant Norman Dwight Parker's Motion to Suppress Tangible Evidence and Statements, (Docket No. 22), and Motion to Suppress Identification, (Docket No. 24). The United States has responded to each. (Docket Nos. 26, 34.) The Court held a hearing on this matter on April 14, 2014, in Louisville, Kentucky. This matter is now ripe for adjudication. For the reasons explained below, the Court will DENY each of Parker's Motions.

**Factual Background**

On November 21, 2013, officers of the Louisville Metro Police Department ("LMPD") received complaints of gunshots in the Victory Park area of Louisville, Kentucky. Detective Mike Nobles conducted surveillance on the area from an unmarked police vehicle, aided by binoculars. Detective Nobles testified that he first observed a gathering outside a house on the 2200 block of West Kentucky Street. (Docket No. 42 at 6:13-7:12.) He suspected that a black male wearing a University of Kentucky hooded sweatshirt with a "pull-down hat" with "gray fuzzy ears on it" was carrying a gun in the waistband of his pants. (Docket No. 42 at 7:4-25.) Detective Nobles later observed the same individual running through an alley to a lot at 2237

West Kentucky Street and approach an abandoned red vehicle; the individual then "pulled the handgun from his waistband . . . bent down in the car, shut the door, walked down to his blue sedan, and got in it," driving away. (Docket No. 42 at 9:18-20.) Detective Nobles then advised other LMPD officers via radio that someone had placed a handgun in the abandoned car and communicated "the description of [the individual], what he was wearing, the description of the car, and the direction it was traveling." (Docket No. 42 at 11:1-2.)

Roughly five minutes later, Detectives Jodi Speaks and Mark Brown stopped the sedan a short distance, approximately four houses, from 2237 West Kentucky Street, ostensibly because its driver was not wearing a seatbelt. (Docket No. 48:1-6.) Upon stopping the vehicle, the detectives found that Parker was its driver and sole occupant. In the front passenger seat of the vehicle, the detectives observed in plain view a blue sweatshirt and hat similar to the one described by Detective Nobles. (Docket No. 42 at 49:13-17.) Meanwhile, Detective Nobles continued to observe the sedan from the time the individual in the blue sweatshirt entered it until the time of the traffic stop. (Docket No. 42 at 12:11-14.) He then conducted an additional, unrelated stop in Victory Park before walking to the location of Parker's vehicle. (Docket No. 42 at 29:14-24.)

Parker complied with Detective Brown's request to step outside and behind the vehicle. (Docket No. 42 at 50-22:25.) Approximately fifteen minutes after the traffic stop, Detective Nobles approached the scene and identified Parker as the individual he had observed with the handgun. Detective Nobles then announced his intention to arrest Parker, as LMPD officers had recovered a weapon from the abandoned red vehicle; accordingly, Detective Brown placed Parker in handcuffs. (Docket No. 42 at 52:18-20.) When Parker questioned why he was being handcuffed, detectives responded, "Because we found the gun." (Docket No. 42 at 15:18-19.)

Although the detectives did not recall the exact wording of Parker's reply, they agree that his words were to the effect of, "You're not putting that gun on me." (Docket No. 42 at 15:19-20; Docket No. 42 at 52:20-23.) Parker was ultimately charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## Analysis

I. **Motion to Suppress Tangible Evidence and Statements**

   a. **The stop of Parker's vehicle, even if pretextual, withstands constitutional scrutiny.**

Parker's initial Motion seeks to suppress any physical evidence and statements obtained from him, arguing that LMPD officers lacked either probable cause or reasonable suspicion to conduct the stop of his car. "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). The Fourth Amendment demands that a traffic stop must not be "unreasonable" under the totality of the circumstances. *Whren v. United States*, 517 U.S. 806, 812-13 (1996). In analyzing the reasonableness of the stop, the Court queries "whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation in fact occurred." *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). "Probable cause is generally defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003).

Here, LMPD detectives observed Parker driving without a seat belt. Kentucky law dictates that "[a] person shall not operate a motor vehicle manufactured after 1981 on the public roadways of this state unless the driver and all passengers are wearing properly adjusted and

fastened seat belt . . . ." Ky. Rev. Stat. Ann. § 189.125(6). Parker does not deny that he violated the law, nor does he challenge that the detectives observed him doing so. Although he contends that the relatively insignificant nature of the seat belt violation does not support the stop, the Court does not agree. A traffic stop is allowable if officers have probable cause that the motorist has violated the law—and even a minor traffic violation provides probable cause for a traffic stop. *See, e.g.*, *Whren*, 517 U.S. at 810; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc), *cert. denied*, 513 U.S. 828 (1994). Because the detectives saw Parker driving without a seatbelt, they had probable cause to believe that a traffic violation had occurred. Therefore, the stop was reasonable.

The Court need not discredit Parker's theory of pretext in order to find it inconsequential: perhaps the detectives indeed stopped the car not because of a seat belt violation but because of the alleged firearm incident—but the stop remains constitutional. A traffic stop's legality hinges upon "the validity of the officers' objective explanation for making the stop, not on the subjective intentions of the officers in initiating the stop." *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). Even if the traffic offense is a minor one, an officer's subjective intentions are extraneous to the Fourth Amendment analysis:

> A traffic stop supported by probable cause . . . may not be invalidated under the Fourth (and Fourteenth) Amendment on the ground that the officers stopped the car for "pretextual" reasons which is to say, acted upon a violation of one set of laws . . . in order subjectively to enforce another set of laws . . . .

*Herbin*, 343 F.3d at 809; *see also Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (per curiam) (holding that an officer's improper motivation does not render a custodial arrest for a traffic violation unconstitutional); *Whren*, 517 U.S. at 812-13 (explaining that an officer's

subjective intention in initiating a stop does not govern the stop's legality). For these reasons, the Court perceives no illegality in the traffic stop of Parker's vehicle.

### b. The seizure of clothing from Parker's vehicle was lawful.

Parker also maintains that the officers lacked probable cause to seize the clothing items from his car. (Docket No. 22 at 2.) *Michigan v. Summers*, 452 U.S. 692 (1981). In response, the United States argues that this seizure was constitutionally sound, as the items constituted evidence of a crime and were in plain view to the detectives. (Docket No. 42 at 72:12-15.)[1]

Under the automobile exception to the Fourth Amendment's warrant requirement, an officer may perform a warrantless search of a detained vehicle if he has probable cause to believe the vehicle contains contraband or evidence of criminal activity. *Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998); *Maryland v. Dyson*, 526 U.S. 465, 466-67 (1999) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). The automobile exception applies even when the officer's initial stop of the vehicle was grounded in pretext. *See United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *Whren*, 517 U.S. at 812-813). For many of the reasons discussed above, the Court concludes that probable cause existed to search Parker's vehicle, given the facts known to the detectives at the time, based on the circumstances relayed by Detective Nobles. The detectives reasonably

---

[1] The government argues only in passing that Parker voluntarily consented to the search of his vehicle. (*See* Docket No. 42 at 49:19-21, Testimony of Detective Brown ("I asked Mr. Parker if I could get consent to search his vehicle. Mr. Parker said, 'Go ahead. You may search.'"); Docket No. 42 at 50:11-15.) Parker does not rebut this testimony. When the government argues that a defendant consented to search, it must prove that, under the totality of the circumstances, the consent was "unequivocal, specific, and intelligently given, uncontaminated by duress and coercion." *United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). However, because the parties have not robustly discussed this issue, the Court will decline to address it.

5

believed that the vehicle may have contained evidence of a crime; thus, they had probable cause to search it in an effort to locate any such evidence and to determine the identity of its owner.

In the course of the justified stop, detectives encountered arguably incriminating evidence in plain view: the clothing items described by Detective Nobles, situated on the vehicle's passenger side. The plain view doctrine establishes that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citations omitted).

In *Colorado v. Bannister*, 449 U.S. 1, 3-4 (1980), the Supreme Court applied the plain view doctrine to an officer's seizure of evidence from an automobile. The officer observed both that the vehicle's occupants matched a description of individuals suspected of a theft and that certain automobile parts on view in the open glove compartment resembled parts that were reported stolen. The Court held that these facts afforded the officer probable cause," allowing him to seize these items without a warrant. *Id.* at 4. *Bannister* affirmed that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton v. New York*, 445 U.S. 573, 587 (1980).

This case presents similar circumstances, as the detectives were lawfully in a position from which to observe the clothing items in the passenger seat of Parker's vehicle. Because the detectives reasonably associated the hat and sweatshirt with alleged criminal activity, the plain view doctrine justifies their seizure. The incriminating nature of the items was immediately apparent, given Detective Nobles' description of them only moments prior to the stop.

Moreover, they were immediately visible without moving anything in the vehicle. Next, the detectives were lawfully in a position to view the clothing items and have access to them. Therefore, their discovery of the evidence in the vehicle's passenger seat falls under the plain view exception.

As mentioned above, the common-sense probable cause standard requires only that the facts available to the officer would "warrant a man of reasonable caution in the belief" that certain objects may be contraband, stolen property, or evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 162 (1925). The analysis hinges upon a "practical, nontechnical" probability that incriminating evidence is involved; the officer's determination need not be either correct or more likely true than false. *Brinegar v. United States*, 338 U.S. 160, 176 (1949). *See also United States v. Cortez*, 449 U.S. 411, 418 (1981) (explaining that "the process [of determining probable cause] does not deal with hard certainties, but with probabilities" and that law enforcement officers are permitted to "formulate[] certain common-sense conclusions about human behavior.").

These considerations, along with the totality of the circumstances, confirm the reasonableness of the detectives' belief that the clothing items in Parker's vehicle constituted evidence of a crime. The detectives lawfully viewed the clothes in the passenger seat of Parker's car and recognized their potentially incriminating character, having associated them with Detective Nobles' observations. This nexus gave the detectives probable cause to believe that the items were subject to seizure. Because this nexus satisfies the generous probable cause standard, Parker's argument regarding the clothing's seizure fails.

### c. Because officers arrested Parker with probable cause and he was not subject to interrogation, his statements need not be suppressed.

Parker next argues that because he was arrested without probable cause, that any statements obtained from him must be suppressed. Because the Court does not agree with Parker's premise, it must accordingly reject his conclusion. Under the Fourth Amendment, a police officer has probable cause to arrest when, under the totality of the circumstances, the information he has at the moment of arrest is "sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence would be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.* The Court must scrutinize the events that led up to the arrest, then determine "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). As explained above, the detectives' stop and subsequent arrest of Parker satisfies the liberal probable cause standard.

Parker further contends that the statements he made as he was being handcuffed resulted from an unwarned custodial interrogation and are therefore inadmissible pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* established that a defendant's statements made in response to interrogation while in police custody are inadmissible unless he has first been apprised of the constitutional right against self-incrimination and has validly waived this right. *Id.* at 478-79. "In the absence of a custodial interrogation, the requirement to recite the *Miranda* warnings is not triggered and the analysis is at an end." *United States v. Woods*, 711 F.3d 737,

740 (6th Cir. 2013) (citations omitted). Therefore, the Court must determine whether Parker was subject to a custodial interrogation.

The parties agree that when law enforcement officers recovered the firearm from the abandoned vehicle, Parker replied to the effect of, "You can't put that gun on me." (Docket No. 42 at 15:19-20; Docket No. 42 at 52:20-23.) The government concedes that Parker was in custody at the time of his statement and had not been issued the *Miranda* warnings. (Docket No. 42 at 73). Therefore, the remaining issue is whether Parker's statement was made in response to an "interrogation" within the *Miranda* framework or was instead a "[v]olunteered statement," the admissibility of which is not affected by *Miranda*. *See Miranda*, 384 U.S. at 478.

*Miranda*'s safeguards are triggered not only by express questioning, but also by its functional equivalent—that is, to "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980). In this case, no law enforcement officers asked Parker questions about his ownership or possession of the gun in question. Neither was Parker subjected to the "functional equivalent" of interrogation, since the officers made no particularly evocative comments and had no reason to anticipate that their actions would prompt an incriminating response. Although Detective Brown testified that Lieutenant Steimle asked Parker if he was a convicted felon, there is no evidence that Parker responded to this question. (*See* Docket No. 42 at 65:15-16.) Consequently, Parker has not established that his statements were prompted by an interrogation within the scope of *Miranda*, and their suppression is not compelled.

## II. Motion to Suppress Identification

Parker's second Motion asks the Court to suppress "any identification of the defendant as the perpetrator of the charged offense" – specifically, Detective Nobles' identification of Parker as the individual who placed the gun in the abandoned vehicle. (Docket No. 24 at 1.)

Parker first argues that because the stop and search of Parker's vehicle was unsupported by probable cause, any identification is the fruit of an illegal arrest. As discussed above, the Court finds that Parker's arrest was not illegal. Detectives Speaks and Brown had probable cause to believe that Parker had violated the law by driving without a properly fastened seat belt, thus justifying the stop. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Moreover, Detective Nobles' observations, coupled with the clothing items visible in the passenger seat, provided LMPD officers with probable cause to arrest Parker for possession of a firearm. Accordingly, the officers committed no constitutional violation.

Parker further contends that the identification procedure was "so unnecessarily suggestive as to create a likelihood of misidentification." (Docket No. 24 at 2.) He characterizes the identification as an unduly suggestive show-up. (Docket No. 42 at 74:12-13.)

A defendant's Fourteenth Amendment right to due process of law is violated if the "confrontation leading to the identification was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). A defendant cannot be subjected to the introduction of evidence of

identifications that were obtained through impermissibly suggestive procedures. *Simmons v. United States*, 390 U.S. 377, 384 (1968). However, even identifications obtained through suggestive means may nonetheless be admissible provided they are reliable. *Manson v. Brathwaite*, 432 U.S. 98 at 116-17 (1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

The Court must first determine whether the identification procedure was suggestive. *See Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). If so, the Court proceeds to evaluate whether "there are nevertheless sufficient independent indicia of reliability." *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). "Reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114.

The Court does not agree that the identification procedure was unduly suggestive. "When only one person is presented to a witness, there is a natural tendency for the witness to feel obligated to provide a positive identification." *Summit v. Bordenkircher*, 608 F.2d 247, 252 (6th Cir. 1979). However, no such tendency existed here. The one-person "show-up" consisted only of Parker only because Detective Nobles observed the entire scenario during the five minutes that it unfolded, from the time he alerted his colleagues to the incident and described Parker's appearance until Detectives Brown and Speaks stopped Parker's vehicle. (Docket No. 42 at 9:16-12:10.) Accordingly, the Court sees no risk that LMPD personnel manipulated the evidence in order to facilitate a suggestive identification. Detective Nobles' prompt, on-the-scene confrontation did not affront Parker's constitutional rights.

In addition, the Court notes that numerous indicia of reliability strengthen Detective Nobles' identification. The Supreme Court has enumerated the factors that guide a court's evaluation of an identification's reliability. These factors include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation.

*Neil*, 409 U.S. at 199-200. In light of these factors, the Court must measure the likelihood that the witness would make an irremediable misidentification. The Court will consider each of the *Neil* factors in turn.

The first *Neil* factor concerns the witness's opportunity to view the criminal at the time of the crime. *Neil*, 409 U.S. at 199. Detective Nobles testified that he had ample opportunity to observe the individual who placed the gun in the abandoned car. (Docket No. 42 at 5:16-20.) At approximately four o'clock in the afternoon, the sun had not yet set. (Docket No. 42 at 4:14-18.) Although he estimated that the distance between his parked vehicle and the 2200 block of West Kentucky Street was less than two football fields long, he used binoculars to augment his vision. (Docket No. 42 at 5:-12-17.)

As for the second factor, the degree of Detective Nobles' attention, the Court notes that he was not a "casual or passing observer, as is so often the case with eyewitness identification," but a veteran police officer who received special training on conducting surveillance and providing accurate identifications. (Docket No. 42 at 3:8-4:5.) Detective Nobles watched the individual with an eye toward providing accurate identification afterward. As an experienced officer, he likely knew that his observations would later be subject to the rigors of the investigation and perhaps trial processes.

The third factor concerns the accuracy of the witness's prior description. *Id.* at 199. Detective Nobles' description of a person driving a blue sedan with a blue University of

Kentucky sweatshirt and hat fit Parker's profile. The hat was particularly distinctive: Detective Nobles explained that "[i]t was a blue U of K hat with a gray – it had gray fuzzy ears that came down and gray fuzz on the brim, like the forehead." (Docket No. 42 at 4-6.) Moreover, as he observed the individual with the gun, he simultaneously described that person to his fellow detectives via radio. (Docket No. 42 at 5:3-12.) According to Detective Brown, Detective Nobles relayed that "the same individual he observed place the suspected firearm into the Mercury [i.e., the red car] entered into the blue sedan and started driving Westbound on Kentucky." (Docket No. 42 at 47:16-18.) Detective Brown continued, "As we were getting close, Detective Nobles was relaying to us that's the vehicle." (Docket No. 42 at 47:24-25.)

The fourth factor is the level of certainty demonstrated by the witness. Detective Nobles expressed no ambiguity as to the accuracy of his identification, and no circumstances suggest that he was mistaken.

Finally, the Court considers the time between the crime and the confrontation. *Id.* Detective Nobles identified Parker in short order. He testified that between five and ten minutes elapsed between his observing the individual placing the gun in the abandoned car and his approaching the blue sedan that his colleagues had stopped. (Docket No. 42 at 12:23-13:2.) His observations likely remained fresh in his mind, given the brevity of the period between the act and the identification.

Each factor thus points to the reliability of Detective Nobles' identification of Parker; none is outweighed by the allegedly suggestive nature of the identification process. The Court need not determine that identification evidence is flawless or unimpeachable as a prerequisite to its admission; rather, it will "rely upon the good sense and judgment of American juries, for

evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson*, 432 U.S. at 116. *See also Smith v. Perini*, 723 F.2d 478, 482 (6th Cir. 1983) ("A defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." (quoting *Bordenkircher*, 608 F.2d at 253).

**Conclusion**

For the reasons stated above, it is ORDERED as follows:

(1) The Motion to Suppress Tangible Evidence and Statements, (Docket No. 22), is DENIED.

(2) The Motion to Suppress Identification, (Docket No. 24), is DENIED.